This relates to the denial of a preliminary injunction motion, the Sandoz and Teva cases, it was pending in Chicago, the case we just argued was pending in Virginia. The district court in this case denied the preliminary injunctions and we think on the basis of faulty claim constructions. In particular, with respect to the term peak and with respect to the term about. And I'd like to start with peak. Ordinarily a peak is nothing more than the numerical apex of x-ray counts to identify a particular diffraction angle. It's basically the location of the peak and that's what our claims talk about. But below the district court added limitations to that term relating to two things, intensity and second, purity. And there are different concepts that are not referenced in our claims with respect to peaks. Let me talk about intensity first. Our claims do refer to diffraction angles, peaks at diffraction angles. And that is a completely different concept from the intensity of a peak once identified. A peak's intensity is measured by its x-ray count. And it's usually denoted as a relative value. When you scan a sample, the tallest peak automatically gets 100. A peak that's half that height gets a 50. A quarter of that height gets a 25. That concept is actually discussed in our specification. We have columns listing peak locations or peak angles and separately listing peak intensities. We did not include any intensity values in Claim 1. It's only about peak angles. And so we think it was something, I mean, we deliberately omitted intensity limitations from Claim 1. And so we think it was incorrect for the district court to import intensity limitations. There's another implicit requirement. Did the district court in this case buy your argument that there are trace amounts of crystalline A and it's in the Q's product? The district court did not, but it did not do so through the wrong frame of reference. And the court was looking for large peaks as the tall and dramatic peaks. In finding that we didn't show the presence of crystal A, the district court used the wrong prism. The right prism is peak is correctly defined. The wrong prism is looking for a peak that is tall and dramatic or something significant. We did find peaks. And in fact, the court held your peaks do exist, but, and I quote, they look nothing like the features displayed on Figure 1. And those are the taller peaks that the court was referring to. So the second thing, it's not only intensity limitations that were implicitly added here, but it was also purity. And here's why this is really important to our company, our case. The intensity of a peak can turn entirely on the purity of the sample. And here's why. Crystal A, it's an anhydrate. Crystal A has a peak at 14.7. It's very prominent. If you mix crystal A with a different crystal that has even more intense peaks, suddenly 14.7 can look de minimis. What does crystal B find expression in example 16 of the prior art 334 patent? It does not, your honor. In fact, it's not only, clearly example 16 in the prior art patent doesn't refer at all to what was being obtained as a crystal. And it's not only Abbott and Astellas. If you repeat the example 16, do you get crystalline B form? You do not. It's a hotly tested debate between the parties. But we have in the record from A3767 to 72, a complete recitation of all the work that was done to try to reproduce example 16 in this litigation. We have experts on it. They have experts on it. We say you don't get it if you faithfully- If we have that kind of a factual dispute on whether or not their products in the prior art, isn't the district court entirely within its discretion to say, with that kind of a dispute at stake, I'm not going to give you an injunction? The judge never reached that issue. If the court were to reach that issue, it could evaluate whether there was a likelihood of success on the invalidity issue based on example 16. But the district court never reached that issue. And here's just two points to consider. Before this litigation, Lupin said to the patent office, now it's Lupin, said to the patent... Lupin and Sandoz. Lupin said, in other words, to the patent office when they were looking for their own crystal patent, the 334 patent does not state whether the saptonere produced is crystalline, semi-crystalline, or amorphous at 6016 of the Lupin record. Sandoz said the same thing. And they said that at 295 of the Sandoz record. So both of our opponents here were taking the position before this litigation that example 16 didn't give you any information about amorphous and Sandoz even ran some tests to prove it. Now, back to just the purity point. Can I ask another question? Yes, absolutely. Does bioequivalency for FDA purposes equate to the doctrine of equivalence for patent infringement purposes? It does not, Your Honor. It is one of the factors that we listed, but we listed a lot more on the... Necessary, but not sufficient. It's necessary, but not sufficient. Certainly necessary. Yeah, it's certainly necessary. This is one of the issues here. The two, clearly we believe Teva and Sandoz have both the anhydrate, that's crystal A, and a monohydrate. And we think both of those crystals infringe. But if the monohydrate doesn't literally infringe... That's the B. The labels get a little confusing because actually we think the B is something called a sesquhydrate, but they have the monohydrate. So by the way, if we waived B, we waived the sesquhydrate, not the monohydrate. We're going after the monohydrate now. But here's the thing with the doctrine of equivalence. Unless you were to say that crystal patents never can ever be subject to the doctrine of equivalence, we've got a doctrine of equivalence case here that the district court never really addressed. And here's why. Nobody ever made any sefton near crystal before, ever. It was languishing on a shelf. We were the first to come along and make it from non-useful to useful. We were the same function way result. What's the function of the crystal? Well, the prior artomorphous was entirely unstable. It was useless. So the function is to increase the stability and also the solubility. When you say both ways, are we talking crystal A, crystal B? Is that what you mean by both ways? It doesn't matter. It's either the monohydrate... The only difference between the two is there's a water inserted into the monohydrate and it changes the crystal structure. That's it. That is an insubstantial difference when you look at it in the context of the purpose of this invention, which is to improve the crystal compared to the amorphous. In our spec, we talk about the fact that you improve the stability by creating a crystal form of this compound. And that's what makes it a commercially useful drug. The monohydrate does the same thing. So that's the function. How do they do it? Well, the reason crystalline compounds are often more stable than amorphous is because you have this ordered molecule arrangement rather than random. And when all the molecules are hitting each other randomly, they tend to break apart more quickly. So not only do they have the same function, they achieve that function in the same way. But I understand, or understood, at least the district court to have ruled on, at least for purposes of preliminary injunction, on the doctrine of equivalence on a much narrower ground of simply saying that Dr. Atwood gave unsupported testimony in support of the doctrine of equivalence argument and therefore chose not to credit it, which in a preliminary injunction setting would be an option that the district court could exercise. Well, I think what you said was he didn't quantify it. And that is legally irrelevant in our mind. I think you used the term unsupported with reference to Dr. Atwood. With quantifiable evidence along those lines. But the point here is whether B or A is stable for 24 months or 28 months or 30 months, entirely irrelevant. The point here is to get the kind of stability you need to get it on the market. And so that's why we think the doctrine of equivalence is something that it should have been addressed on the merits. And it wasn't, in our view. Getting back to peaks, purity requirement, very quickly. If you have 10% anhydrate and 90% monohydrate, the peaks from A that are really large will look only 10% the size. Why? Because you only get 10% of the x-ray counts. And according to this court in Glaxo, there's no such thing as de minimis infringement. So if we find peaks from crystal A in the defendant's sample, they infringe. And it doesn't matter how tall the peaks are. That's an irrelevancy. They're going to be smaller if there's less A. Although in the nature of these the peaks get small enough of distinguishing between just noise and what you're referring to as peaks. And my understanding was that what the district court was concerned by was that you hadn't shown peaks that distinguished themselves sufficiently from just the noise. I think that is not correct. Everybody agrees that the platform is you have to be statistically significant above the noise for there to be a peak. Even though the noise expresses itself in what looks like peaks. You have to be statistically significant above the peak. And there was really no debate that we were showing peaks that were statistically significantly above the noise. The reason the district court discounted the evidence was they weren't tall enough. That was the reason. Tall enough. Intense enough. Intense enough vis-a-vis the noise or intense enough vis-a-vis something else? Something else. And that's the problem. Clearly the district court was looking for tall and dramatic peaks. That's why our evidence kept getting rejected. There wasn't tall and dramatic peaks. The peaks we found didn't look like figure one. And a peak has nothing to do with how tall it is. Once you identify the peak there's a separate inquiry which is intensity. And the district court also in our view just the word about it's designed. That's another problem that we had with the district court's claim interpretation which is the word about is intentionally designed to avoid rigid boundaries. Here the district court gave the word about rigid boundaries of plus or minus 0.1. Plus or minus 0.1. But that's belied by... But you still have to have discernible bounds according to the understanding of one of skill and the art. Absolutely. And one of skill and the art doesn't have rigid boundaries because the error detection depends on a bunch of things like the machine you're using, how many samples you run, how you prepare the samples. And so there should not be a rigid boundary around the word about. So the district court never evaluated the evidence except through the rigid boundary that it had created which is contrary to what the evidence is. Both sides put in evidence of different boundaries around peak angles. Anywhere from 0.05 to 0.1 to 0.2 clearly there is no set standard for a rigid plus or minus 0.1 in this art. And the district court never viewed the evidence correctly on that score because it applied a rigid boundary and said well if you didn't meet the rigid boundary you're out. I'll reserve the rest of my time. Thank you. Thank you. Thank you. Mr. Maloro? Trying to split your time. Yes. I'm trying to split my time and I will do my best to sit down at the appropriate time while answering questions you have for me. The order of the district court denying the preliminary injunction should be affirmed. The court carefully analyzed whether or not the defendant's products had crystal A, the anhydrous material. Counsel just stood up and said the anhydrate is crystal A just as their expert did at trial. That was the agreed claim construction governing the preliminary injunction motion. The court evaluated and determined correctly that the defendant's products, crystal B, monohydrate, aren't covered by that. The court also separately analyzed whether or not the defendant's products had trace amounts of crystal A and the court heard testimony from the experts, watched the experts go over the data and the graphs, watched the expert explain just how it was that there's no trace amount of crystal A, made a fact finding. That fact finding is entitled to substantial deference, there's an abuse of discretion standard, and on that basis alone there's no infringement, there's no likelihood of success, certainly not a substantial and insubstantial question. The defendants have raised substantial questions for sure. Mr. Hearst referred to hotly contested debates between the parties on various issues. On this sort of a preliminary injunction record, that alone provides the district court with discretion to deny. What about, you may be getting it, unless this is counsel's going to address the Peeks issue. Could we go directly to the Peeks? Yes. I could respond to Mr. Hearst's points about the Peeks. Yes. Counsel stated that an intensity requirement was imported into the claims by the district judge and the district judge did not do that. As a matter of fact, at A9 and A10 of Judge Anderson's decision, he specifically addressed the Peeks requirement and specifically said that Judge Payne had noted no intensity requirement in the claim, that's what he was following, but the court correctly noted that the Peeks must somehow be Peaks that are distinguishable of Crystal A. And that was in responding to the argument that Crystal B somehow has the Peaks of Crystal A. You said that there's only 10% of the monohydrate form you'd expect a 10% Peak. Judge Payne, in fact, in his ruling specifically talked about the fact that you might have mixtures of Crystal A and something else, and therefore you wouldn't expect a pattern that looks just like Figure 1 in the patent, for example, in that instance, but Crystal A might still be present. And the judge specifically, in our case, looked at the evidence of whether or not there are trace amounts of Crystal A, and in fact looked at a spiking experiment that Abbott had done and listened to the evidence from the Teva expert that, in fact, that spiking experiment shows there's no Crystal A. But Mr. Hurst was arguing that the court erred with respect to intensity in requiring more than discrimination from background noise. That was his response to my question on that. And I would assume that he would point to A9 in which the Judge Payne's statement that the 507 patent simply does not support a reading of peaks under which a peak would exist at every point of measured intensity above the background noise. So at least one way of reading that is that the district court was rejecting the argument that small peaks were sufficient. And they didn't have to be, rejecting the argument that small peaks were sufficient. I would respond in two senses. The judge also on A10 further discussed Judge Payne's decision where Judge Payne said that peaks which were nothing like the features displayed in Figure 1 were nonsensical. And small peaks were exactly what the judge looked at with respect to the evidence that Abbott put in, the spiking experiments, for example. In that context, the judge had moved beyond is Crystal B, Crystal A? And he was looking at are there small amounts of Crystal A mixed in with Crystal B? And those were small peaks that were being cited by Abbott. There was a lot of for example, which was put in at A1799. These were small peaks. As a matter of fact, on 1799, you can see that they had to highlight and blow up the evidence. That was Abbott's evidence. That's what the judge considered. So it's not as though the court rejected that small peaks could sometimes be infringement. It was that the small peaks that Abbott was relying on in this case were not evidence of Crystal A. With regard to the term about, can I switch just slightly, looking at irreparable harm for a minute? After someone, it became apparent that the claim construction hadn't gone the way that Abbott had expected. They went to their own generic and put some product into the marketplace. What significance does that have? There was no irreparable harm at the time that the court denied the preliminary injunction motion. And one reason for that was exactly that fact, Your Honor. This company, Dava, was already taking orders for products. But would it be fair of us to take into consideration their attempt to survive in the marketplace after a legal ruling hadn't gone their way? Is it fair to hold that against them in this irreparable harm setting? It's fair to hold it against them when they themselves genericized the market. In other words, Abbott didn't wait- They had much choice, is the point. The legal rulings had cut against them, and it was a survival instinct. Do you think it's fair to factor that into the irreparable harm? Yes, I do believe it's fair when the brand jumps the gun and launches the generic first. In other words, the brand didn't wait for the generics and launch concurrently with the generics. And I know they have an argument that they could have pulled their authorized generic back if there was still to pull it back. But they themselves made this a generic market. They withdrew their motion against Lupin. They gave up their trial against Lupin. But it wasn't as if this is their choice. I mean, they're under extenuating circumstances. Absolutely, but the extenuating- So you think we should still hold that against them? They're certainly entitled to make commercial choices, and they made some commercial choices. But that's inimicable to proceeding with arguing irreparable harm and seeking a preliminary injunction. At that point, they faced a choice. And the choice was to proceed with the legal proceeding, argue irreparable harm, argue they wanted to maintain their exclusivity with their branded product, or make a different commercial choice. They made the different commercial choice. I think we'd better move to Ms. Addy. Thank you. Good morning, Your Honors. This case is about surrender. Abbott purposefully removed Crystal B after its JP-199 in all of its applications filed based on the JP-199. And it did define Crystal A as its invention in its 507 patent. Many times it refers to Crystal A as the invention. And I refer to you to- It mostly says the present invention of Crystal A, which does seem to suggest that Crystal A can be a subset of the invention, doesn't it? Your Honor, look for example at column one, lines 34 to 36 at A61 of the record. After an intensive study, the inventors of the present invention succeeded in obtaining the compound one as the special crystalline form for IE, Crystal A, and completed the present invention. IE, that is. In addition, the JP-199 separately described and claimed Crystals A and B. And the prosecution history here for the 507 patent describes Crystal A as a novel crystalline form. In addition, inventors- Hard to read it any other way, isn't it, Ms. Addy? It really is. Inventor Shirai testified that Crystal B was removed in its entirety from the 507 patent. I'd like to also address some issues with regard to peaks. The word peaks is used in claim one in addition with the term PXRD pattern. And when you go back into the spec and you look at how the term peaks is used in the spec, the patentees describe the highest angles of Crystal A in different examples. And I believe they recite 15 of the highest angles in examples two and four. But then when they talk about the seven angles that they claim in claim one, they talk about those angles as peaks. And those are the seven of the highest angles with respect to the 15 described in examples two and four. When you go back into the spec and you look at how those seven highest angles are described, they're described as distinguishing peaks. Was this case, was the claim construction ever considered to be anything other than a product by process claim in your litigation? Your Honor, the claim, the judge did not identify whether or not it was a product or process claim. The judge resolved the issue on Crystal A and this entire case can be resolved on the interpretation of Crystalline as Crystal A because it is in present in claims one through five. Are you going to speak to the about issue? I would like to speak to the about issue. It seemed to have gotten cut off. Would you? I would. About is present in the claim and there are two examples, as I mentioned before, that talk about the highest peaks, the highest angles, excuse me. And those examples, each of the angles are less than 0.1 apart. And one of ordinary skill in the art in reading the specification would know that the precision of a diffractometer is about 0.1 apart. And if he didn't know that, he might go to the official standard setting authority, which is the U.S. Pharmacopeia. The U.S. Pharmacopeia says that the precision of a diffractometer is about 0.1 plus or minus. And Abbott, too, understands that the U.S. Pharmacopeia has a setting of about plus or minus 0.1 apart. And that's what it says in other of its own applications. And we have an example at JP1605 and that's at paragraph 20. But in this case, it says that it's plus or minus 0.2, I believe. However, we think it's clear that one of ordinary skill in the art would construe about to be plus or minus 0.1. I'd also like to address, I believe... On what basis would we attach a numerical limit to a term that's as open as about? In this case, Your Honor, because the intrinsic evidence shows the examples which are less than 0.1 apart and because the standard setting authority, the U.S. Pharmacopeia, states that diffractometer precision is plus or minus 0.1, it's appropriate to use the plus or minus 0.1 that the district judge found. Or should you ever use a rigid, specific number in interpreting the term about? I think that's what the question Judge Rader was reaching for. In this case, Your Honor, we think that about is appropriate because of the specification and because of the direct link that one of ordinary skill in the art would know to go to the Pharmacopeia. I'd also like to address the experiments that were done on the prior art patent, the 334 patent. Abbott mentioned that that was a hotly contested issue and we disagree. This is example 16 you're talking about? Example 16, yes, Your Honor. The experiments that Abbott referenced, first of all, the contrary statements that Abbott referenced are in a totally unrelated application and the apparent alleged inconsistency is currently being resolved in prosecution. However, I also would like to direct you to the record in Lupin's case and I believe example 16 is discussed in Lupin's red brief and the fact that there were experiments that were done on the prior art patent is in the record in Lupin's red brief at page 10. So there is evidence that the judge considered and that evidence was also present in our case that example 16 of the 334 prior art patent produced crystals. Our tests were run and we had four tests run that example 334 produced crystal B. When you say the evidence was present in your case, did the district judge deal with that question? The district judge had that evidence before him. He didn't specifically reference it in his decision. That's what I was trying to remember. I didn't think he had. He did say and under the preliminary injunction standard, he said that defendants have argued that the reason the plaintiffs left out crystal B was because crystal B was contained in example 16 of the 334. And under the preliminary injunction standard, he thought that he didn't say, but we believe that he thought that there was a substantial question of validity raised. Now as I understand it, just real world question, I understand that these products are now being sold widely on a generic basis. That's correct, your honor. And that's been true since the expiration of the earlier patent? That's correct, your honor. Thank you, Ms. Addy. Thank you, counsel. Thank you, your honor. I think you just gave me a pay raise. Could we restore Mr. Hearst's rebuttal time so he'll have four minutes remaining? Thank you, your honor. I want to address the phrase in the patent. Mr. Hearst, before you get to that, just picking up on the question I asked, in thinking about the equitable factors here, should we pay attention to the fact that there's a lot of the institution of an injunction would change the status quo at this point? I think if you were to agree with our position on the merits, I think that the correct procedure at this point in time would be to remand for reassessment on the merits under the new circumstances. Things have changed. There's no doubt that things have changed. We believe we are still being irreparably harmed every day in this marketplace and that every day is causing us further irreparable harm, but the record isn't up to date on that issue. I think the proper procedure is to look at the merits and the claim construction. If you would agree with us on peaks and about, to return it to Judge Anderson to review the current circumstances. What do we do about your entry into the generic market in factoring in irreparable harm? I think your question's really hit it on the head, your honor. Are we not permitted to try mitigate our damages? That's all we were doing. We knew that the market would be destroyed if generics got on, but we didn't want to suffer that damage in total. We tried to mitigate our damages and we did it in a way that allowed us to pull the generic off the market if we were to reverse the situation. The phrase in the patent- That is then relevant to the question of irreparable harm, isn't it? I think it is not because obviously you make different levels. You have a different situation when you insert a generic into the market versus when you are a brand. With the generic, we are merely mitigating our damages. We are not fully removing our damages by any stretch. We are still being irreparably harmed on the brand side of things. The phrase in the patent, the inventors of the present invention succeeded in obtaining the compound one as special crystalline form, i.e. crystal A, and completed the present invention. Just two points. We equated special crystalline form with crystal A. This supports our point. We didn't use the phrase special crystalline form in the claims. We used the generic phrase crystalline. That could not have been more clearly a deliberate choice because we knew how to use the specification. Think of the redundancy that gets created. Five duplicative claims, literally, because every limitation after the phrase crystalline, if you replaced it with crystal A, would be entirely redundant, entirely unnecessary, and the situation would be this. Claim one, crystal A, period. Claim two, crystal A, period. All the way down to claim five, crystal A, period. We do not think it's a sensible way to read our claims when we deliberately chose the generic term, crystalline, as opposed to the term discussed in the spec, crystal A. If plain meaning has any value, it ought to control it here. About the point one, just very quickly. Actually, the pharmacopeia, it says typically crystal diffraction peaks can be reproducible to plus or minus point one or two. It actually says or two, recognizing that there's no concrete limit up or down point one under all circumstances. Someone of skill in the arts is going to consult that source, aren't they? If they do. Isn't that going to inform the outcome? It might inform them, but it would inform them that it's a flexible standard, point one to point two. Is the two referenced as an alternative or as the total amount produced by a plus minus one? I think it's clearly an alternative. It's an alternative. Because think of it this way. It's saying reproducible two. The question the pharmacopeia is asking is how far away are you from the target? They say, well, here's how far away you're going to be away in terms of reproducibility. The two doesn't reflect a range. It would have to be written in an entirely different way. Plus, there's other art. The Cabri article says point two as well. Can you give us some closing thoughts, Mr. Hirsch? Yes. There was a lot of discussion about invalidity. It was not an issue. Indefiniteness was never addressed. Obviousness was never addressed. Anticipation was never addressed. The reproductions of example 16 were never addressed. So in terms of resolving the invalidity issue, we're not even at the starting gates yet. So that, to me, is not an appropriate way to resolve the case. Rather, the case ought to be resolved on the claim construction issues. If we're right on peak, if we're right on a bow, we suggest a remand. Is this litigation ongoing in the district court? Or has it been stayed pending the resolution of this appeal? It's been stayed pending resolution of this appeal. Thanks. Thank you, your honors. Thank you very much. Thank you.